UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:06-cr-27

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | ORDER |
| EDDIE JOE WALKER (1) | ) | |
| Defendant. | ) | |
| | ) | |

**I.   INTRODUCTION**

On February 7, 2007, Eddie Joe Walker was convicted by a jury on two counts. Count One charged a violation of Title 18, United States Code, Section 371, conspiracy to receive, store, sell, and dispose of stolen electronic goods, construction equipment, furniture, vehicles, and food items that had crossed a state-line after being stolen, in violation of Title 18, United States Code, Section 2315. Count Two charged Walker with aiding and abetting the transportation of stolen goods in interstate commerce, in violation of 18 U.S.C. §§ 2314, 2, and 21.

Following the trial, Walker renewed his motion for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure on the grounds that the government improperly manufactured federal jurisdiction by transporting stolen goods from North Carolina to South Carolina for the sole purpose of luring Walker across state lines, often referred to as an "Archer defense." After listening to oral arguments on the matter, the Court took the motion under advisement, and invited further briefing. For the reasons discussed below, the Court will deny the defendant's motion.

1

## II.     FINDINGS OF FACT

Eddie Walker owned and ran a small pawnshop in Charlotte, North Carolina and was suspected of trafficking in stolen goods. As a result, the government instituted a sting operation in which Officer Hank Suhr posed undercover using the name of "Mack," and told a cover story that he was a thief traveling back and forth from New York. (Gov. Ex 1A). Suhr's mission was to enter Walker's pawnshop, present various stolen items from his break-ins, including electronics, DVD players, and televisions, and see if Walker was interested in purchasing them. (Trial Tr. at 28).[1]

Suhr first visited the pawnshop on July 22, 2003, introduced himself and presented a DVD player, a drill, and a television. Walker bought the first two after having been told they were stolen from a warehouse. (Trial Tr. at 33; see also Gov. Ex. 1A). Walker asked Suhr whether he had any plasma TVs, at which time Suhr told him that if he sees any he would transport them back and forth from New York (Gov. Ex. 1A).

A second visit to the pawnshop and sale of certain goods occurred on February 3, 2004. Walker asked Suhr if there was a way to get in touch with him. Suhr provided Walker with a pager number. (Trial Tr. at 44; see also Gov. Ex. 2A). The next day Walker called Suhr's pager. When Suhr responded, they discussed different types of stolen goods Walker was interested in purchasing. Walker also volunteered, "I could probably fix it so you could take the truck full both ways . . . This

---

[1] The undercover officer, Suhr, told the defendant he was coming back and forth from New York and the surveillance audio tapes of meetings between the two capture numerous conversations which, taking the evidence in a light most favorable to the government, indicate a knowledge of the interstate nature of the transportation of stolen property: Walker: "I could probably fix it up so that you could take the truck both ways." (Gov. Ex. 3A); "[T]his is furniture country, I could send you . . . up with a full load of furniture . . . and come back with electronics." (Id.); Suhr: "I'll definitely talk it over with my people and see if we can get that, uh, you know, either here another truck here, and go back up with that . . ." (Gov. Ex. 3A); Walker: "Is there any interest in anything going back up?" (Gov. Ex. 4A); Walker: "Well it's got, we got plastic to wrap it in and stuff like that but you could, ah, you know throw some dry ice in there . . . you're good to go for the trip." (Gov. Ex. 4A); Walker "[T]he reefer [refrigerator] can be turned down they could be frozen and you could by the time you got there it would be ready to be served." (Gov. Ex. 4A); Suhr: "[I]f I'm coming down in a bigger truck . . ." (Gov. Ex. 5A).

is furniture country, I could send you . . . up with a full load of furniture . . . and come back with electronics." (Gov. Ex. 3A). A series of approximately 5 to 10 conversations ensued for the purpose of arranging a larger transaction that eventually took place on March 2, 2004. On February 24, 2004, Walker again asked Suhr, "Is there any interest in anything going back up?" (Gov. Ex. 4A). They further discussed different sorts of goods and the preferred location for the transaction. Walker's partner, Britt,[2] wanted to use a facility approximately 25 miles north of Charlotte, later determined to be Shelby, North Carolina. (Gov. Ex. 4A).

On February 25, 2004, another conversation took place about the price and location. Suhr emphasized to Walker that because they were still getting to know each other, that he (Suhr) wanted to meet at his location of choice, and that at their next deal he would be willing to meet at the location provided by Walker's partner. Walker stated that he would run this proposal by his partner and call Suhr later. (Gov. Ex. 5A; see also Trial Tr. 55-56). On March 1, 2004, the day before the deal was to take place, they once again discussed price and location. Suhr informed Walker he had just driven through Columbia, South Carolina "a little while ago." (Ex 6A). Suhr said this to be consistent with his cover story that he was coming up and down the East Coast and to set up a story about using a facility in South Carolina. (Trial Tr. 59). When asked on direct examination why he was reluctant to meet at the location provided by Walker's partner, Suhr answered, "Well, it was for - - the main reason was officer's safety. I had no idea where this location was and I was afraid that I could potentially get robbed or get hurt. . . ." (Trial Tr. at 56). He further testified to other reasons why he wanted to meet at the South Carolina location: first, to further stick with the cover story of

---

[2] James Oakley Britt was a co-defendant to Walker who pled guilty to Count One (conspiracy to violate 18 U.S.C. §§ 2314 and 2315) and Count Three (the substantive offense of violating 18 U.S.C. § 2315).

3

being a big time thief working up and down the East Coast; and second, that the gas station he had chosen was safest in that there was a lot of traffic with people going in and out, which provided safety (Trial Tr. at 58); that it was easier to get to, that he had already chosen that location on the map, and that the cover agents were already at the location. (Trial Tr. at 114). He also testified that at some point prior to the actual pick up, Walker originally agreed to the South Carolina meeting point, but that he changed his mind and pushed for meeting at a Shell gas station on Westinghouse Boulevard in Charlotte, the preferred location of Britt. (Trial Tr. at 59). Suhr testified that he drove the goods from a Target in Charlotte to the South Carolina location and waited to meet Walker's partner. After Suhr told Walker over the phone that he was in South Carolina with the stolen goods, Walker convinced him to come up to the Shell gas station on Westinghouse Boulevard. (Gov. Ex. 6A). It was on March 2, 2004, that Suhr and Britt met at a Shell gas station in Charlotte for Britt to view the stolen goods.

## III. STANDARD OF REVIEW

"The test for deciding a motion for a judgment of acquittal is whether 'the evidence and inferences therefrom most favorable to the prosecution would warrant the jury's finding the defendant guilty beyond a reasonable doubt.'" United States v. Dominguez, 604 F.2d 304 (4th Cir. 1979) (quoting Burks v. United States, 437 U.S. 1, 16 (1978)); see also United States v. Wooten, 503 F.2d 65 (4th Cir. 1974) (same); United States v. Ammons, 682 F. Supp. 1332, 1336-37 (W.D.N.C. 1988) (same). "A decision to overturn a jury verdict for want of substantial evidence must be 'confined to cases where the prosecution's failure is clear.'" United States v. Grubbs, 773 F.2d 599, 601 (4th Cir. 1985) (quoting Burks, supra, at 17).

## IV. ANALYSIS

### A. Count Two

The circuit courts have expressed concern with law enforcement improperly manufacturing federal jurisdiction for the purpose of transforming a local crime into a federal one. The doctrine took root in the case United States v. Archer, 486 F.2d 670 (2d Cir. 1973). In Archer, the Second Circuit held the evidence was insufficient to establish a violation of the statute prohibiting the use of telephone facilities in interstate or foreign commerce to commit bribery where the several disputed interstate phone calls were artificially contrived by police to manufacture federal jurisdiction. The first call in question was fabricated for the sole purpose of obtaining jurisdiction, which the court rejected outright as violative of the congressional intent behind the Travel Act. Id. at 682. The second call was made by the defendant across state lines, but was rejected by the court as an artificially contrived plan by the government that would not have been made otherwise. Id. The third call was made by the government from Paris, France, when the agent was in Paris for other legitimate business reasons. While this call was not planted in the sense the others were, it was merely a "casual and incidental occurrence." Id. The court found that "the call served no purpose that would not have been equally served by a call from New York." Id. at 683.

The "Archer" defense has been developed further by other circuit courts including the Fourth Circuit Court of Appeals. In United States v. Brantley, 777 F.2d 159 (4th Cir. 1985), the Fourth Circuit refused to find jurisdiction in a gambling case where the only interstate activity was the FBI's moving of gambling tables and machines, liquor, and other agents across state lines in order to establish the gambling front. The court found that such interstate movement was "wholly unnecessary," and that the "commercial predicate" for federal jurisdiction could not be established

by such contrived means. Id. at 163.

The Fourth Circuit reversed a conviction in United States v. Coates, 949 F.2d 104 (4th Cir. 1991). There the defendant solicited a federal informer to commit a murder-for-hire. Agents made a short trip from Maryland to Virginia for the sole purpose of making an interstate telephone call to the defendant to discuss details of the scheme. The Court rejected this jurisdictional ploy stating: "[w]e rely entirely on the fact that the *only* reason the sole jurisdiction link occurred here was that it was contrived by the government for that reason alone [i.e., jurisdiction]." Id. at 106 (emphasis in original).

In Archer and Coates the sole reason for slipping across state-lines was to manufacture federal jurisdiction. The instant case is readily distinguishable from Archer and Coates. Suhr credibly testified that in addition to establishing federal jurisdiction, there were numerous other reasons for crossing state lines, including to further his cover story of regularly transporting stolen goods up and down the East Coast, his concern with officer safety, and his lack of trust in using the co-defendant's facility on a first time deal. These articulated reasons take the instant case outside the purview of Coates. In this respect, this case is a case of first impression in the Fourth Circuit, whether jurisdiction is improper where agents deliberately crossed state lines to establish federal jurisdiction but also had credible non-jurisdictional reasons for doing so. For the reasons that follow, the undersigned does not believe the Fourth Circuit would extend Coates to the factual context posited here.

First the defendant here understood the interstate nature of the undercover scheme. Walker believed that Suhr transported stolen goods up and down the East Coast; he suggested on at least two occasions before the March 2nd deal that Suhr go both ways with a truck full of stolen goods (Gov.

Ex. 3A and 4A); Suhr told Walker on the phone that he was coming up through South Carolina with the goods (Gov. Ex. 6A), and, after the transaction in question, the defendant and his co-defendant discussed with Suhr about trips to New York. (Gov. Ex. 8A).

The second reason for not extending Coates to the instant case is that the defendant intentionally invited Suhr to cross state lines. After being informed by Suhr that he was in fact in South Carolina, Walker persuaded him to transport the known stolen goods across state-lines to a location in Charlotte, North Carolina. (Gov. Ex. 6A).

For similar reasons, this case is not controlled by the outcome in Brantley. There, the Fourth Circuit emphasized that the interstate activity of transporting the gambling tables and machines, liquor, and undercover FBI agents across state lines in furtherance of the sting operation was "wholly unnecessary." Brantley, 77 F.2d at 163; see also Archer, supra, at 183 ("the call served no purpose that would not have been equally served by a call from New York"). The Fourth Circuit in Brantley refused to convert a local sting operation into a federal crime on such contrived conduct. Here the Court can not say the crossing of state lines was "wholly unnecessary," inasmuch as it did further a necessary cover story given to the defendant who was a willing participant in what he believed was a scheme to transport stolen goods across state lines. The defendant wants the Court to consider the physical crossing of state lines in a vacuum. However, there is nothing wrong with the government arranging an interstate sting, and waiting to see if the defendant bites. "There is no entrapment in such a situation, any more than the flashing of a roll of bills on a public street is the entrapment of an alert robber." United States v. Gambino, 566 F.2d 414, 419 (2d Cir. 1977) (holding that government did not unlawfully contrive federal jurisdiction by setting up an interstate sanitation company to lure the defendants who, in violation of the Hobbs Act, were using unlawful force to

drive out competitors in the industry).

A final reason for believing that the Fourth Circuit Court of Appeals would not extend the holding in Coates to the instant case is the fact that recent circuit court decisions considering the Archer defense have limited it for reasons present in the instant case.

The instant conduct is similar to that upheld in United States v. Peters, 952 F.2d 960 (7th Cir. 1992). There, an undercover agent arranged for the defendant to deliver a stolen truck across state lines. The government cited numerous reasons for arranging the drop-off point across state lines, including officer safety and to further a cover story in addition to the admitted intent to establish federal jurisdiction. The Seventh Circuit affirmed jurisdiction finding that, "Mr. Peters freely and voluntarily drove his stolen truck from Illinois to Indiana," and therefore the interstate element was not furnished solely by undercover agents as in Archer. Id. at 963. "Mr. Peter's showed no reluctance in joining a conspiracy that would result in his stolen truck being transported out of Illinois. . . . [T]here is no evidence that Mr. Peters felt himself limited by an particular boundary; he desired to dispose of the truck where the opportunity arose." Id. (citing United States v. Gardner 516, F.2d 334 (7th Cir. 1975) and United States v. Edwards, 366 F.2d 853, 867-68 (2d Cir. 1966)).[3]

In another Seventh Circuit case, United States v. Skoczen, 405 F.3d 537 (7th Cir. 2005), the Court upheld jurisdiction where the interstate requirement was met when the government shipped stolen cigarettes across state-lines, reasoning that the defendant "had no expectation that there was

---

[3] See Peters, 952 F.2d at 963, n.6 (providing numerous references and parenthetical notes to cases limiting the applicability of the Archer defense (apart from those present in the text), including: United States v. Faison, 679 F.2d 292 (3d Cir. 1982) (interstate phone calls placed at the behest of the defendant); United States v. Brooklier, 685 F.2d 1208 (9th Cir. 1982) (the defendants and federal agents participated in interstate activity); United States v. Esch, 832 F.2d 531(10th Cir. 1987) (the defendants intentionally communicated using the mail service across interstate lines; United States v. Smith, 749 F.2d 1568 (11th Cir. 1985) (where defendant, not the government, instigated the out-of-state travel at issue).

8

an in-state source of fresh Marlboro cigarettes." Id. at 543. In distinguishing the facts from Archer and Brantley, the court noted that the defendant's "contacts told him that the trailer [of cigarettes] was coming from the south . . . ." Id. at 543. His knowledge of the interstate activity, and willingness to participate in such activity, established sufficient interstate nexus.

The Second Circuit on numerous occasions has likewise limited the scope of the Archer defense, giving greater consideration to the knowledge and willingness of the defendant to participate in the interstate activity. See United States v. Wallace, 85 F.3d 1063, 1065-66 (2d Cir. 1996) (providing "Courts have refused to follow Archer when there is any link between the federal element and a voluntary, affirmative act of the defendant").[4]

The Fifth Circuit in United States v. Clark, 62 F.3d 110 (5th Cir. 1995) was confronted with the situation where a government agent suggested the defendant deliver a stolen car across state-lines for the sole purpose of establishing federal jurisdiction. The court found it more significant that "the defendant voluntarily and of his own free will did the act that caused the interstate element to exist." Id. at 114. The Court concluded, "[t]he fact that a government agent took steps to ensure the existence of the interstate element of the offense and the fact that satisfaction of the interstate element was the sole reason for the taking of those steps do not cause the indictment to be subject to dismissal." Id.

The defendant in this case freely chose to participate in an interstate crime. The record

---

[4] See Wallace, 85 F.3d at 1065-1066 (providing numerous references and parenthetical notes to cases limiting the applicability of the Archer defense (apart from those present in the text), including:
United States v. Keats, 937 F.2d 58, 64-65 (2d Cir. 1991) (where interstate calls made by federal agents satisfied jurisdictional elements as long as it was "reasonably foreseeable" to defendants that the calls would take place); United States v. La Porta, 46 F.3d 152, 160 (2d Cir. 1994) (where FBI informant asked a suspected arsonist if he would set fire to his "daughter's car"; conviction for destroying government property was upheld because "the defendants themselves committed the substantial jurisdictional act of burning the government [car]."

indicates that Walker was fully aware of the interstate nature of his relationship with Suhr; Suhr made clear that his modus operandi was to break-in warehouses and to transport the goods up and down the East Coast; Suhr told Walker that he could transport a stolen plasma TV from New York; before the March 2nd transaction, Walker suggested on at least two occasions going both ways with a truck full of stolen goods; and more particularly, on March 2nd, Suhr told Walker on the phone that he was coming up through South Carolina with the goods. Suhr attempted to perform the drop-off in South Carolina, but Walker insisted on the drop-off occurring in North Carolina for the sake of convenience for his partner, Britt. Lastly, the act was not solely performed by the government: Walker persuaded Suhr to transport them across state-lines to a location in Charlotte, North Carolina. See United States v. Shields, 999 F.2d 1090 (7th Cir. 1993) (Archer defense inapplicable where defendant insisted to one undercover agent that another undercover agent come into the defendant's state); see also United States v. Smith, 749 F.2d 1568, 1569 (11th Cir. 1985) ("government agent's trip to Detroit in this case was done at the appellant's behest"); see also United States v. Hassan, 36 F.3d 1094, 1994 WL532863, at *4 (4th Cir. Oct. 3, 1994) (unpublished table decision) ("site was ultimately suggested by [the defendant] himself"). As the defendant is charged with aiding and abetting the crime in question, the awareness of the interstate activity, the willingness to participate in the interstate activity, and finally the persuasion to come across state-lines with the stolen goods is sufficient to meet the charge.

### B. Count One

The Court's analysis of the Archer defense in Count Two applies even more so to the conspiracy charged in Count One. In addition to the above reasons, the Court denies the motion as to the conspiracy count because the element the defendant contends was "manufactured," i.e.,

interstate transportation, is not an element of 18 U.S.C. § 371. In affirming the conspiracy count in Brantley, the Fourth Circuit explained that:

> Upon a charge of conspiracy . . . it is simply irrelevant that, because of facts unknown to the conspirators or to the actor, an actual effect upon commerce was impossible. This is consistent with the general rule applicable to inchoate offenses . . . . The facts may be taken to be as the conspirators believed them to be.

Brantley, 777 F.2d at 164.

Additionally, the evidence regarding the interstate transportation of a stolen skid loader, which value exceeded the statutory amount triggering federal jurisdiction was not implicated by the jurisdiction-creating conduct of the agent. It alone suffices to establish jurisdiction on the conspiracy count.

## V. CONCLUSION

After reviewing "the evidence and inferences therefrom most favorable to the prosecution" the Court finds that a reasonable jury could conclude that the defendant is guilty of Counts One and Two.

**IT IS, THEREFORE, ORDERED** that the defendant's motion for acquittal be **DENIED.**

Signed: March 21, 2007

Robert J. Conrad, Jr.
Chief United States District Judge